UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RICKEY SHEW and FRANCES SHEW,

    Plaintiffs,

v.                        Case No.: 8:16-cv-766-T-33JSS

WILLIAM HORVATH,

    Defendant.

_____/

**ORDER**

This matter comes before the Court pursuant to Plaintiffs Rickey and Frances Shew's Motion for Partial Summary Judgment, (Doc. # 49), filed on February 16, 2017, and Defendant William Horvath's Motion for Summary Judgment, (Doc. # 50), filed on March 1, 2017. Because Horvath is entitled to qualified immunity, the Shews' Motion is denied and Horvath's Motion is granted.

## I.   **Background**

Plaintiffs Rickey and Frances Shew are a married couple from Hernando County, Florida. (Doc. # 49-3 at 1; Doc. # 49-4 at 1; R. Shew Dep. Doc. # 50-3 at 24:5-9). In 2008, Mrs. Shew noticed cracks in the walls of their home and contacted the couple's homeowners insurance company, Florida Farm Bureau, to inspect the damage. (F. Shew Dep. Doc. # 49-7 at

48:2-49:2; Doc. # 50-10 at 1). Farm Bureau sent experts from two different engineering and geological firms to determine whether there was a sinkhole on the Shews' property causing the structural damage. Both the initial experts, HSA Engineering and Scientists, and the firm hired to do a peer review of HSA's findings, Universal Engineering Sciences, concluded that the cause of the damage was not a sinkhole. (Doc. # 49-3 at 1; Doc. # 27-1 at 112). Then, in May of 2009, Farm Bureau notified the Shews that it would not renew their policy. (Doc. # 27-1 at 115).

After Farm Bureau refused to renew their policy, the Shews contracted with a public adjuster through whom they hired an attorney to contest Farm Bureau's determination. (Doc. # 49-3 at 1; Doc. # 49-4 at 1; Horvath Dep. Doc. # 27-1 at 17:8-19). In their complaint filed against Farm Bureau, the Shews alleged: "On or about December 15, 2008, the Insured Property was damaged by a sinkhole and/or sinkhole activity and MR & MRS. SHEW suffered a loss to their Insured Property and they continue to suffer such loss." (Doc. # 34-3 at 2). The Shews, through their public adjuster and attorney, hired Bay Area Sinkhole Investigation and Civil Engineering (B.A.S.I.C.). B.A.S.I.C. inspected the property and prepared a report concluding that the structural damage to the Shews'

home was caused by sinkhole activity. (Doc. # 49-3 at 1; Doc. # 50-7 at 4). After reviewing B.A.S.I.C.'s report, Universal Engineering changed its opinion and approved the sinkhole finding by B.A.S.I.C. (Doc. # 49-3 at 1; Doc. # 49-4 at 1). B.A.S.I.C.'s report estimated that sinkhole remediation procedures to shore up the home's foundation would cost between $107,185 and $124,185. (Doc. # 50-7 at 4). The Shews received a copy of B.A.S.I.C.'s report and kept it in their home, but they claim they did not read it. (R. Shew Dep. Doc. # 50-3 at 70:3-11).

The Shews and Farm Bureau then entered a settlement agreement for $240,000, which was signed on August 16, 2010. (Doc. # 50-10). The document, signed by both Mr. and Mrs. Shew, states the Shews' "property suffered a covered loss due to sinkhole activity on or around December 15, 2008." (Id. at 1). The document also specifies Farm Bureau "[did] not admit to liability of any sort." (Id. at 3). Following the dismissal of the lawsuit, in October of 2010, Farm Bureau filed a document with the Hernando County Clerk, which states: "Pursuant to Florida Statute [section] 627.7073(2)(a), please find the enclosed land subsidence report which confirms and certifies sinkhole activity at the residence of Rick and Fran Shew . . . ." (Doc. # 50-6). No sinkhole remediation was

performed on the Shews' property. (Horvath Dep. Doc. # 27-1 at 18:15-18; Doc. # 49-3 at 1). Instead, Mr. Shew patched the cracks in the home's walls with drywall. (Horvath Dep. Doc. # 27-1 at 18:15-18; R. Shew Dep. Doc. # 50-3 at 73:15-74:14). The Shews paid off the mortgage on their home in 2010, and a satisfaction of mortgage document was filed with the Hernando County Clerk on September 16, 2010. (Doc. # 49-3 at 2; Doc. # 27-1 at 128).

Years later, in 2014, the Shews put their home up for sale, using Catherine Sickler as their real estate agent. (F. Shew Dep. Doc. # 49-7 at 69:18-70:1). The Shews subsequently entered into a contract to sell the property for $229,000 to the Jernigans, in June of 2015. (Doc. # 34-5). That sales contract read in part:

> SELLER DISCLOSURE: **Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to the Buyer.** Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

(Doc. # 34-5 at 12)(emphasis added). The sales contract had a "time is of the essence" clause, requiring the Jernigans to

apply for a mortgage within five days of the contract's execution. (Id. at 2). The sales contract was also contingent upon the Jernigans "obtaining a written loan commitment" within thirty days. (Id.).

After being alerted by a friend that the Shews' home may have a sinkhole and having their application for homeowners insurance denied by State Farm, the Jernigans became suspicious. (Doc. # 49-5 at 1; Doc. # 49-6 at 1-2; Jernigan Dep. Doc. # 50-2 at 21:13-18). Mr. Jernigan contacted his real estate agent, who in turn contacted the Shews' real estate agent, Ms. Sickler, to discuss the sinkhole issue. (Jernigan Dep. Doc. # 50-2 at 22:17-25; Doc. # 49-5 at 1-2). Ms. Sickler turned over various documents to Mr. Jernigan about the investigation of the sinkhole, which she had obtained from the Shews' house with their permission. (Horvath Dep. Doc. # 27-1 at 24:23-25:4; Jernigan Dep. Doc. # 50-2 at 23:8-14; 27:2-19).

Having learned of the sinkhole problem, Mr. Jernigan again offered to buy the home, but only at the reduced price of $100,000. (Doc. # 49-5 at 2-3; Doc. # 49-6 at 3). After the Shews rejected Mr. Jernigan's lower offer, the Jernigans sought to have the $1,000 in escrow and $514 in inspection fees returned to them. (Doc. # 49-5 at 3; Doc. # 49-6 at 3).

The Shews sent a check for the Jernigans' costs to the title insurance company handling the transaction, along with a letter requesting the Jernigans sign it as a release from any legal action against them. (Doc. # 49-5 at 3). The Jernigans left the money in the insurance company's account and refused to sign the letter. (Id.).

Mr. Jernigan contacted the Hernando County Sheriff's Office to initiate an investigation of the Shews' conduct. Mr. Jernigan spoke with Horvath, a detective with the Sheriff's Office, by phone on October 1, 2015. (Horvath Dep. Doc. # 27-1 at 4:12-17; 10:3-11). He informed Horvath that "he wanted to buy a house and signed a contract on it and realized that the house had a sinkhole that he didn't know about, that he wasn't told about." (Id. at 10:3-11). During that conversation, Horvath arranged an in-person interview with the Jernigans for October 5, 2015. (Id. at 10:13-14).

During the interview, Mr. and Mrs. Jernigan filled out written statements. (Doc. # 49-5; Doc. # 49-6). In his written statement, Mr. Jernigan wrote:

> The first time I looked at the house the homeowner was there, while speaking with the homeowner, I asked about any problems the home may have had. Rick Shew told me the light fixture had an exposed wire and he fixed it. That was the only deficiency he brought to my attention.

(Doc. # 49-5 at 1). Mr. Jernigan also gave the documents in his possession to Horvath. (Jernigan Dep. Doc. # 50-2 at 40:18-41:3). During his investigation, Horvath obtained a copy of the sales contract, a copy of the Shews' complaint against Farm Bureau, the settlement agreement between the Shews and Farm Bureau, the document Farm Bureau filed with the Hernando County Clerk in October of 2010, and the expert reports from Universal Engineering and B.A.S.I.C. (Doc. # 27-1 at 53-64; 110-12; 117-29; Doc. # 34-3; Doc. # 50-7).

Although Mr. Jernigan had applied for a mortgage within five days after execution of the contract, he did not inform Horvath of that fact. (Jernigan Dep. Doc. # 50-2 at 17:24-18:3). Thus, while executing the probable cause affidavits, Horvath did not know if the disclosures signed by the Shews were relied upon by a mortgage lender and did not know if the sales contract qualified as part of the mortgage lending process. (Horvath Dep. Doc. # 27-1 at 32:4-8; 39:9-24).

Horvath separately interviewed Mr. and Mrs. Shew over the phone because the Shews were out of the state. During his conversation with Mrs. Shew, Horvath asked if she remembered filing a sinkhole claim with Farm Bureau. (Horvath Dep. Doc. # 27-1 at 19:15-17). According to Horvath, "[s]he responded by stating that she and her husband had a sinkhole company

come out and were told they did not have a sinkhole. Then [she] stated that they had a sinkhole attorney because the Farm Bureau Insurance canceled their insurance and a claim was never filed." (Id. at 19:17-22).

Mrs. Shew also indicated she believed the lawsuit against Farm Bureau was for the bad faith non-renewal of their insurance policy, rather than for a sinkhole. (Horvath Dep. Doc. # 27-1 at 20:11-21:3). She emphasized Mr. Shew handled all issues related to the lawsuit and she did not read the settlement agreement or know there was a sinkhole. (Id.; F. Shew Dep. Doc. # 49-7 at 104:12-17). Similarly, during her deposition, Mrs. Shew asserted that Mr. Shew handled the sale of the home and that she did not interact with the Jernigans. (F. Shew Dep. Doc. # 49-7 at 84:20-85:1; 85:4-5).

During his conversation with Horvath, Mr. Shew told Horvath he had no idea the house had a sinkhole problem, but "admitted that he filed an insurance claim with Farm Bureau due to structural damage in his house." (Horvath Dep. Doc. # 27-1 at 16:21-24). After Farm Bureau refused to renew the homeowners policy, Mr. Shew "claimed he hired a public adjuster named Ricky Seidel to handle the non-renewal," which Horvath found unconvincing "because public adjusters do not handle non-renewal." (Id. at 17:8-11). Mr. Shew also

acknowledged "Seidel inspected his home and believed the damages were caused by a sinkhole," which Horvath considered a contradiction of Mr. Shew's claim that the lawsuit was about the non-renewal. (Id. at 17:14-19). Then, as Horvath described in his deposition,

> [Mr. Shew] made another statement that made no sense based on his self-proclaimed ignorance. He stated that prior to listing the home on the market, he checked with the Hernando County Clerk and property appraiser to see if any official reports had been on file against his home and property regarding confirmed sinkhole activity. He claimed to have found nothing. However, I discovered an official document that was filed by Farm Bureau Insurance stating just that, dated October 6, 2010, and recorded on October 14, 2010.

(Id. at 18:4-12). Mr. Shew also acknowledged in his interview with Horvath that "no sinkhole remediation process ever occurred on the property and the only repairs were done by him, which was patching cracks in the drywall." (Id. at 18:15-18).

Although he spoke with the Shews, Horvath never went to their home to inspect whether the sinkhole and resulting structural damage were "readily observable." (Id. at 25:13-26:6). Instead, he reviewed the engineering reports in his possession regarding the sinkhole and damage to the Shews' home, which indicated there were cracks in the walls when the reports were made in 2009 and 2010. (Id. at 26:7-14). At the

time of the affidavit, Horvath also did not know how much of the $240,000 settlement the Shews ultimately received. (Id. at 35:4-11).

In addition, Horvath interviewed the Shews' real estate agent, Ms. Sickler. Ms. Sickler "presented [Horvath] with information/documents that she had in her files pertaining to the residence, which included the paperwork for the window and door replacement, the sales contract between the Jernigans and the Shews, and the letter that she sent with the refund check to finalize the matter." (Id. at 23:13-20). According to Horvath:

> Even though I never brought the subject up, Catherine spontaneously uttered, "And when I asked them about this, they had no idea." Then she paused. And then she said, "No idea," she explained it. I responded to her statement by asking, "Asked them about what?" And Catherine responded, "I said are you kidding me? This is a sinkhole house. I needed to disclose that."

(Id. at 24:3-10). Sickler also "confirmed that [Mrs. Shew] was involved in the sales process, but [Mr. Shew] had the say-so because she still works and he is retired." (Id. at 23:20-22).

On October 12, 2015, Horvath executed probable cause affidavits outlining the results of his investigation to obtain arrest warrants for the Shews. (Doc. # 49-3 at 2; Doc.

# 49-4 at 2). Horvath brought the affidavits to an assistant state attorney, who approved and told Horvath to take them to the judge. (Horvath Dep. Doc. # 27-1 at 12:2-7; 45:1-5). The probable cause affidavit for Mr. Shew, which is substantially the same as that for Mrs. Shew, states:

> Before Me, the undersigned authority, personally appeared <u>Detective William Horvath</u> who, being duly sworn, alleges, on information and belief, that on the <u>16th</u> day of <u>June</u>, <u>2015</u>, in Hernando County, Florida, the defendant did:
>
> Commit the offense of Mortgage Fraud through a coordinated scheme involving the defendant's spouse and co-habitant, Frances Shew [], by making material misstatement, misrepresentation, and omission that would be relied upon by a mortgage lender involving the contracted sale of their residence . . . to buyer (victim) Christopher Jernigan.
>
> This case involves the signed contract regarding the sale of a home in Hernando County that is owned by the defendant and his wife Frances Shew. . . . In 2008, the home was insured by Florida Farm Bureau Insurance Company . . . .
>
> In December 2008, the defendant and co-defendant filed claim number 455980 with Farm Bureau Insurance reference[s] damages observed to the structure of the residence. Per [Florida Statutes section] 627.707, Farm Bureau Insurance initiated a geotechnical investigation of the residence, using HSA Engineering and Scientists . . . . The defendant and co-defendant were notified of the subsidence investigation in April of 2009. The report by HSA Engineering was conducted on September 14, 2009, and stated that **"sinkhole activity is not a cause of the noted damage in the structure."**

In order to appease the defendant and co-defendant, Florida Farm Bureau Insurance Company requested a Peer Review of the HSA subsurface exploration. The insurance company solicited Universal Engineering Sciences, including Professional Geologist Meagan Gonzales [] and Professional Engineer Mark K. Hardy [] to review the report. Both concluded that they agreed with the HSA report that the damages were not attributed to sinkhole activity.

The defendant and co-defendant contracted with Florida State Insurance Adjusters, Inc. . . . They were represented by Public Adjuster Randy Seidel, who arranged a contract between the defendant, co-defendant, and Attorneys Danahy & Murray . . . . The defendant and co-defendant filed suit against Florida Farm Bureau Insurance Company for what was policy limits, totaling $240,000.00. [] Another subsidence investigation was performed by a company named B.A.S.I.C. (Bay Area Sinkhole Investigation and Civil Engineering) . . . . Professional Geologiest David E. Hewitt [] and Professional Engineer Justin D. James [] performed the investigation. Their report was released on June 29, 2010, and stated **"sinkhole activity is the cause of structural distress at the Shew residence within a reasonable, professional probability."** On August 10, 2010, the same professional engineers from Universal Engineering Sciences submitted their approval of the findings in the B.A.S.I.C. report.

On August 16, 2010, the defendant and co-defendant were awarded the sum total of $240,000.00 in a settlement with Florida Farm Bureau Insurance Company. The Lawsuit was dismissed without prejudice on August 20, 2010.

On October 6, 2010, Florida Farm Bureau Insurance Company filed Hernando County Clerk document # 2010054791 referenc[ing] the UES report confirming sinkhole activity pursuant to [Florida Statutes section] 627.7073(2)(a). There are zero Notices of Commencement regarding sinkhole remediation on file with the Hernando County Clerk. There are zero sinkhole remediation reports or Engineer's Final

Inspection Reports on file with the Hernando County Clerk regarding this property.

On September 16, 2010, Hernando County Clerk document # 2010049657 was filed referenc[ing] the Satisfaction of Mortgage for loan number 0017604349 belonging to Wells Fargo Home Mortgage, Inc.

On June 16, 2015, the defendant and co-defendant entered into a contract to sell their home to Christopher Jernigan. The defendant and co-defendant DID NOT disclose that the home had confirmed sinkhole damage, and offered the home with an asking price of $250,000.00 (full market value). The purchase price of $229,000.00 was agreed upon between the buyer and the defendant and co-defendant.

Paragraph (j) of the sales contract disclosure statement reads:

"Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to the Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation."

Even though the defendant profited greatly from the insurance pay-out, the defendant claims to have no knowledge of any sinkhole activity at his residence, even though he was completely and fully involved in the sinkhole investigation and lawsuit.

(Doc. # 49-3)(emphasis original). After presenting the affidavits to a Hernando County circuit judge, Horvath obtained arrest warrants for the Shews on October 12, 2015,

for violation of Section 817.545(2)(a), Fla. Stat. (Doc. ## 50-1). That section states:

> A person commits the offense of mortgage fraud if, with the intent to defraud, the person knowingly: (a) Makes any material misstatement, misrepresentation, or omission during the mortgage lending process with the intention that the misstatement, misrepresentation, or omission will be relied on by a mortgage lender, borrower, or any other person or entity involved in the mortgage lending process; however, omissions on a loan application regarding employment, income, or assets for a loan which does not require this information are not considered a material omission for purposes of this subsection.

Fla. Stat. § 817.545(2)(a).

The Shews turned themselves in to the Hernando County Sheriff's Department on October 16, 2015. (Doc. # 27-1 at 103). The Shews were incarcerated for a few hours before being released on bond. (Doc. # 49-1 at ¶¶ 3, 7; F. Shew Dep. Doc. # 49-7 at 135:9-10). The State Attorney subsequently decided not to prosecute the case and filed a no information. (Doc. # 49-1 at ¶ 4). Thereafter, the Shews initiated this 42 U.S.C. § 1983 action on March 30, 2016. (Doc. # 1).

In the Complaint, the Shews allege Horvath violated their Fourth Amendment right to be free of unreasonable searches and seizures by arresting them on the basis of faulty probable cause affidavits. (Id. at ¶¶ 1, 12). As a result of their arrest, the Shews incurred damages in the form of

attorney's fees, and "monies expended in posting a bond for their release from jail, as well as damage to their reputation, embarrassment, and emotional distress." (Id. at ¶ 13). Horvath filed his Answer on May 10, 2016. (Doc. # 5). On September 8, 2016, the Shews filed a motion for partial summary judgment as to liability (Doc. # 26), which the Court denied as premature on November 10, 2016. (Doc. # 40). After mediation resulted in an impasse (Doc. # 43), the Shews filed their renewed Motion for Partial Summary Judgment on February 16, 2017. (Doc. # 49). Horvath filed his Motion for Summary Judgment on March 1, 2017. (Doc. # 50). Responses and replies have been filed for each Motion. (Doc. ## 51-54). The Motions are ripe for review.

## II. <u>Legal Standard</u>

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla.,

344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is

entitled to judgment as a matter of law on facts that are not genuinely disputed . . . .")(quotation omitted).

## III. **Analysis**

### A. **Qualified Immunity**

"A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity." Crosby v. Monroe Cty., 394 F.3d 1328, 1332 (11th Cir. 2004). In his Motion and response to the Shews' Motion, Horvath argues he is entitled to qualified immunity. (Doc. # 50 at 3; Doc. # 51 at 2).

"Qualified immunity affords complete protection to government officials sued individually," Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012), except in cases where "the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances," Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). Qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.

2002)(quoting <u>Willingham v. Loughnan</u>, 261 F.3d 1178, 1187 (11th Cir. 2001)).

"[T]he official must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." <u>Crosby</u>, 394 F.3d at 1332. "To determine whether an official was engaged in a discretionary function, [a court] consider[s] whether the acts the official undertook 'are of the type that fell within the employee's job responsibilities.'" <u>Id.</u> (quoting <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004)).

The Shews do not contest that Horvath was performing a discretionary function when he investigated them and executed the probable cause affidavits.(Doc. # 49 at 10-11). For good reason. "Making an application for an arrest warrant clearly falls within the official responsibilities of a police detective and, therefore, within the ambit of his discretionary functions." <u>Evans v. City of Plant City</u>, No. 8:07-cv-639-T-MAP, 2007 WL 2916454, at *3 (M.D. Fla. Oct. 5, 2007)(citing <u>Malley v. Briggs</u>, 475 U.S. 335, 342-43 (1986)).

Next, the Court follows a two-part analysis in determining whether qualified immunity applies. <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002). The first part

asks "whether [the] plaintiff's allegations, if true, establish a constitutional violation." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 736 (2002))(internal quotation marks omitted) (alteration in original). The second part asks "whether the right was clearly established." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223, 236 (2009)))(internal quotation marks omitted). Courts have discretion to decide the order in which to address the two parts. Pearson, 555 U.S. at 236. Nevertheless, "[b]oth elements . . . must be satisfied for an official to lose qualified immunity." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010).

**B.   False Arrest or Malicious Prosecution?**

As a preliminary matter, the parties disagree over the nature of the claim asserted by Shews. The Shews characterize their Complaint as bringing a § 1983 claim for malicious prosecution (Doc. # 49 at 17), whereas Horvath argues the Complaint asserts only a single claim for false arrest, (Doc. # 50 at 2). The Court agrees with the Shews: "'an unlawful arrest pursuant to a warrant [is] more closely analogous to the common law tort of malicious prosecution,' than the common law tort of false arrest." Smith v. City of Fairburn, No. 16-

11800, 2017 WL 603840, at *4 n.6 (11th Cir. Feb. 15, 2017)(quoting <u>Calero-Colon v. Betancourt-Lebron</u>, 68 F.3d 1, 4 (1st Cir. 1995) and citing <u>Whiting v. Traylor</u>, 85 F.3d 581, 585 (11th Cir. 1996)). Regardless, this case turns on the issue of probable cause, as the existence of arguable probable cause is a complete bar to both false arrest and malicious prosecution claims. As discussed in depth below, if Horvath had arguable probable cause to arrest the Shews, then he is entitled to qualified immunity and the Shews' § 1983 claim — whether for false arrest or malicious prosecution — must fail.

### C. **<u>Arguable Probable Cause</u>**

Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. An arrest is a seizure of the person. <u>Skop v. City of Atlanta</u>, 485 F.3d 1130, 1137 (11th Cir. 2007). An arrest without probable cause violates the Constitution and provides a basis for a § 1983 claim, but the existence of probable cause at the time of the arrest constitutes an absolute bar to a § 1983 action for false arrest or malicious prosecution. <u>See</u> <u>Case v. Eslinger</u>, 555 F.3d 1317, 1326–27 (11th Cir. 2009)(noting that "[t]he existence of probable cause at the time of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest" (quotation marks

and citation omitted)); see also Rhodes v. Kollar, 503 F. App'x 916, 922 (11th Cir. 2013)("The existence of probable cause constitutes an absolute bar to claims for malicious prosecution.").

"To receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010)(citing Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003); Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)). Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004)(quotation marks omitted).

"An arresting officer is required to conduct a reasonable investigation to establish probable cause." Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998). An officer "cannot conduct a biased investigation, or elect not to obtain easily discoverable facts, or ignore relevant information negating probable cause." Evans, 2007 WL 2916454, at *4 (citing Kingsland, 382 F.3d at 1229). Yet, officers do not have "an affirmative obligation to seek out exculpatory

information of which the officer is not aware" or "track down every lead" before making a probable cause determination. Kelly v. Curtis, 21 F.3d 1544, 1551–52 (11th Cir. 1994). "'Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused.'" City of Fairburn, 2017 WL 603840, at *7 (quoting Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir. 1999)).

Whether a particular set of facts gives rise to probable cause or arguable cause for arrest depends on the elements of the crime. Crosby, 394 F.3d at 1333. "Showing arguable probable cause does not, however, require proving every element of a crime." Brown, 608 F.3d at 735 (citing Scarbrough v. Myles, 245 F.3d 1299, 1302–03 (11th Cir. 2001)). Requiring so "would negate the concept of probable cause and transform arresting officers into prosecutors." Scarbrough, 245 F.3d at 1302–03.

"In cases where a facially valid arrest warrant is issued, a judge has already determined that probable cause existed." Miller v. Eslinger, No. 6:10-cv-1221-Orl-31, 2011 WL 4481260, at *3 (M.D. Fla. Sept. 27, 2011). Therefore, whether a constitutional violation has occurred turns on whether the underlying affidavit was based on misstatements

that were deliberately false or made with reckless disregard for the truth or was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." Drudge v. City of Kissimmee, 581 F. Supp. 2d 1176, 1186 (M.D. Fla. 2008)(internal quotations omitted). "The Eleventh Circuit defines 'reckless disregard for the truth' to include instances where the affiant 'should have recognized the error, or at least harbored serious doubts' about his representations." Evans, 2007 WL 2916454, at *3 (quoting United States v. Kirk, 781 F.2d 1498, 1502-03 (11th Cir. 1986)). But, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause," then the warrant is valid. Franks v. Delaware, 438 U.S. 154, 171 (1978).

A probable cause affidavit also violates the Fourth Amendment "when it contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997)(quoting United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980)). Direct evidence of recklessness is not required; "[r]ather, it 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable

cause the fact of recklessness may be inferred from proof of the omission itself.'" Id.

"Omissions that are negligent rather than reckless are of no constitutional magnitude and will not invalidate a warrant." Smith v. Sheriff, Clay Cty., 506 F. App'x 894, 898 (11th Cir. 2013)(citing Madiwale, 117 F.3d at 1327). The omissions must also be material or significant to invalidate a warrant; "[i]ndeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Madiwale, 117 F.3d at 1327 (citation omitted).

Where the facts are undisputed, whether probable cause existed is a question of law. Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir. 1990); see also Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007)("In this case, there can be no dispute as to what facts the defendants relied on to establish probable cause for the challenged arrest and searches; they are memorialized in warrant affidavits. Thus, whether the affidavits, on their face, demonstrate probable cause[ ] is a question of law."). "In a case such as this one involving an arrest pursuant to a warrant, the matter of whether a constitutional violation has occurred turns on the contents

of the affidavit that was presented in support of the arrest warrant." Drudge, 581 F. Supp. 2d at 1186.

The Shews present multiple arguments for why Horvath's investigation was insufficient and why his probable cause affidavit was executed with deliberate falsity or reckless disregard for the truth. The Court addresses each issue in turn.

### 1.  Mortgage Lending Process

The mortgage fraud statute criminalizes only material misstatements made during the mortgage lending process. See Fla. Stat. § 817.545(2)(a) ("A person commits the offense of mortgage fraud if, with the intent to defraud, the person knowingly: (a) Makes any material misstatement, misrepresentation, or omission *during the mortgage lending process* . . ." (emphasis added)). "[T]he term 'mortgage lending process' means the process through which a person seeks or obtains a residential mortgage loan, including, but not limited to, the solicitation, application or origination, negotiation of terms, third-party provider services, underwriting, signing and closing, and funding of the loan." Fla. Stat. § 817.545(1).

The Shews emphasize the probable cause affidavits do not specify whether the mortgage lending process had actually

begun. Rather, the affidavits state the Shews committed mortgage fraud "by making [a] material misstatement, misrepresentation, and omission that *would be relied upon by a mortgage lender* involving the contracted sale of their residence." (Doc. # 49-3 at 1; Doc. # 49-4 at 1)(emphasis added). And, Horvath admitted during his deposition that he did not know if the Shew's misstatement or omission was relied upon by a mortgage lender and did not know if the sales contract qualified as part of the mortgage lending process. (Horvath Dep. Doc. # 27-1 at 32:4-8; 39:9-24).

The Shews insist that no reasonable officer would have executed the probable cause affidavits before further investigating whether the mortgage lending process had actually begun because that element of the crime had not been definitely established. (Doc. # 49 at 17). "Showing arguable probable cause does not, however, require proving every element of a crime." <u>Brown</u>, 608 F.3d at 735 (citing <u>Scarbrough</u>, 245 F.3d at 1302–03).

Thus, it was unnecessary for Horvath to have direct confirmation that the Jernigans had applied for a mortgage after signing the sales contract. Rather, a reasonable officer in Horvath's position could have believed the Jernigans had initiated the mortgage lending process because

the "time is of the essence" clause in the sales contract required the Jernigans to apply for a mortgage within five days of the contract's execution. See (Doc. # 34-5 at 2). And, to the extent Horvath may have been confused about whether the execution of the sales contract qualified as part of the mortgage lending process, "[u]nder qualified immunity, an officer is protected from suit when he makes a reasonable mistake of law or fact." Watts v. City of Opelika, No. 3:13-cv-742-MHT-PWG, 2015 WL 7450407, at *13 (M.D. Ala. Aug. 26, 2015)(citing Pearson, 555 U.S. at 231).

While it would have been a better practice to determine whether the mortgage lending process was underway before executing the affidavits, Horvath was not required to confirm that after determining probable cause existed. See City of Fairburn, 2017 WL 603840, at *7 ("Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." (citation and internal quotation marks omitted)). Thus, the Court disagrees with the Shews that Horvath's investigation of the "mortgage lending process" element of the crime was unreasonable.

Next, regarding whether Horvath made a deliberately or recklessly false statement or omission in his affidavit, the

Court notes that Horvath did not falsely state that a mortgage lender had relied on the Shews' misstatement or omission about the sinkhole. There is no conflict between Horvath's statement that he believed the Shews' disclosure in the sales contract "would be relied upon by a mortgage lender" and his acknowledgment that he did not know for certain that the Jernigans had applied for a mortgage. (Doc. # 49-3; Horvath Dep. Doc. # 27-1 at 32:4-8).

Regardless, a warrant based on an affidavit deliberately or recklessly omitting material information is invalid "only if that information would have destroyed probable cause." City of Fairburn, 2017 WL 603840, at *8. If the supposedly recklessly omitted information was whether the mortgage lending process was actually underway, then the omission was not material. The inclusion of the answer would not have destroyed probable cause. See Madiwale, 117 F.3d at 1327 ("[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." (citation omitted)). If Horvath had investigated further, he would have reported in his affidavit that the Jernigans had applied for a mortgage within the five-day period specified by the sales contract, and thus the mortgage lending process was underway. (Jernigan

Dep. Doc. # 50-2 at 17:24-18:3). Indeed, Horvath's probable cause affidavits would have been strengthened — not undermined — if he had investigated this element more fully.

In a perfect world, Horvath would have verified that Mr. Jernigan had applied for a mortgage before executing the affidavit. "But perfection is not the standard by which his conduct is judged. Nor is negligence, for that matter." Smith, 506 F. App'x at 900 (citing Madiwale, 117 F.3d at 1327). The Court cannot agree with the Shews that Horvath's conclusion about the Jernigans' mortgage application based on the contract's five-day requirement was unreasonable. Nor can the Court agree that Horvath's statement in the affidavits — that the Shews' misstatement or omission "would be relied upon by a mortgage lender," (Doc. # 49-3; Doc. # 49-4) — was made with reckless disregard for the truth. Thus, Horvath's failure to confirm that the mortgage lending process was underway before executing the probable cause affidavits does not undermine the existence of arguable probable cause.

### 2. "Profited Greatly"

The Shews argue Horvath either intentionally or recklessly made a misstatement in his affidavits when he wrote: "the defendant profited greatly from the insurance pay-out." (Doc. # 49 at 14). At the time of the affidavits,

Horvath did not know how much of the $240,000 settlement the Shews ultimately received. (Horvath Dep. Doc. # 27-1 at 35:4-11). According to the Shews, "[i]n order to make a sworn statement that Mr. and Mrs. Shew profited greatly, Detective Horvath would have to know what [they] obtained from the settlement." (Doc. # 49 at 14-15).

The Court disagrees. Horvath knew that the settlement amount was $240,000 total. (Horvath Dep. Doc. # 27-1 at 4-6; Doc. # 49-3 at 1). And, as stated in the affidavit and uncontested by the Shews, Horvath was aware that the Shews' mortgage was paid off soon after they settled their lawsuit for $240,000. (Doc. # 49-3 at 1). A reasonable officer could conclude that a significant portion of the settlement won in the Shews' lawsuit was used to pay off their mortgage. Horvath did not need to investigate the particulars of the Shews' fee arrangement with their attorney and adjuster to reasonably conclude that the Shews greatly profited from a $240,000 settlement agreement.

And, to the extent the Shews may contest they in fact greatly profited from the settlement, "the Fourth Amendment does not require that statements in a warrant application be 'objectively accurate,' [but] the averments must at least 'be "truthful" in the sense that the information put forth is

believed or appropriately accepted by the affiant as true.'" Thornton v. City of Tampa, No. 8:09-cv-00041-JDW-EAJ, 2010 WL 427737, at *5 (M.D. Fla. Feb. 3, 2010)(quoting Holmes, 321 F.3d at 1083). Taking the facts in the light most favorable to the Shews, a reasonable office could have believed that the Shews greatly profited from the $240,000 settlement.

### 3. "Confirmed Sinkhole Damage"

The Shews argue Horvath falsely stated there was "confirmed sinkhole damage" to their property. (Doc. # 49 at 13-14). They insist the existence of a sinkhole was never confirmed as experts disagreed over whether there was a sinkhole and Farm Bureau admitted no liability in the settlement agreement. According to the Shews, "[a] reasonable, well-trained officer would know of the need to further investigate whether the sinkhole actually existed and would not have discounted the majority opinions of the experts." (Id. at 14).

As an initial matter, the Shews are incorrect that the majority of experts ultimately concluded there was no sinkhole on the property. B.A.S.I.C.'s report finding sinkhole damage, which was prepared on the Shews' behalf no less, was later approved and adopted by Universal Engineering. (Doc. # 49-3 at 1; Doc. # 50-6). In approving

B.A.S.I.C.'s report, Universal Engineering reversed its initial determination that the structural damage was caused by clay settlement rather than a sinkhole. The Shews do not dispute that Universal Engineering approved of B.A.S.I.C.'s findings. Thus, even taking the facts in the light most favorable to the Shews, the majority of engineering and geological experts agreed there was a sinkhole on the Shews' property.

Additionally, the document filed with the Hernando County Clerk "confirm[ed] and certifie[d] sinkhole activity" at the Shews' home. (Doc. # 50-6). The Court disagrees that Horvath acted in reckless disregard for the truth when he stated there was "confirmed sinkhole damage" on the Shews' property, in light of the expert reports and the document "confirm[ing] and certif[ying] sinkhole activity." (Id.).

### 4.  "Readily Observable Facts"

Next, the Shews argue a reasonable officer would not have executed a probable cause affidavit for their arrest without personally visiting their home to determine whether the damage caused by the sinkhole was readily observable. The sales contract states that the Shews had a duty to disclose only damage that was not readily observable. (Doc. # 34-5 at 12). So, according to the Shews, if the damage was readily

observable, no probable cause could have existed for their arrest. (Doc. # 49 at 13).

Horvath never went to the Shews' home to inspect whether the sinkhole and resulting structural damage were "readily observable," and did not know personally if the damage was readily observable. (Horvath Dep. Doc. # 27-1 at 25:13-26:6). Instead, he reviewed the engineering reports in his possession regarding the sinkhole and damage to the Shews' home, which indicated there were cracks in the walls when the reports were made in 2009 and 2010. (Id. at 26:7-14).

But, Mr. Shew also acknowledged in his interview with Horvath that "the only repairs were done by him, which was patching cracks in the drywall." (Id. at 18:15-18). The Jernigans, who both toured the home, did not report seeing any cracks in the walls, or other signs of structural damage. (Doc. # 49-5; Doc. # 49-6). And Mr. Jernigan stated Mr. Shew mentioned only a light fixture's exposed wiring that had been fixed when Mr. Jernigan inquired about problems with the house. (Doc. # 49-5 at 1).

Thus, a reasonable officer in Horvath's position could have concluded the cracks in the walls caused by the sinkhole, which were reported in the engineering reports, were subsequently patched by Mr. Shew. And, while those cracks

were patched with dry wall, an officer could have concluded the Shews did not rectify the underlying cause of the structural damage. To be sure, Mr. Shew admitted during his interview with Horvath that "no sinkhole remediation process ever occurred on the property." (Horvath Dep. Doc. # 27-1 at 18:15-16). Thus, a reasonable officer in Horvath's position could have believed evidence of the damage — the cracks caused by the sinkhole — was no longer "readily observable," but that the sinkhole and resultant damage remained.

### 5. "Coordinated Scheme" and "Fully Involved"

Finally, the Shews argue Horvath's investigation did not support that the Shews had acted with the intent required by the mortgage fraud statute. They contend Horvath had no basis for his statement in the affidavits that Mrs. Shew acted in concert with Mr. Shew "in a coordinated scheme," because Mrs. Shew told Horvath that Mr. Shew handled all matters related to the lawsuit against Farm Bureau. (Horvath Dep. Doc. # 27-1 at 20:11-21:3). Additionally, in her deposition, Mrs. Shew asserts Mr. Shew also handled all aspects of their home's sale. (F. Shew Dep. Doc. # 49-7 at 84:20-85:1; 85:4-5).

Horvath was not required to credit Mrs. Shew's statement that she was unaware of the basis of the lawsuit against Farm Bureau. See Rodriguez v. Farrell, 294 F.3d 1276, 1278 (11th

Cir. 2002)(stating that "a police officer need not credit everything a suspect tells him" (citing Marx, 905 F.2d at 1507 n.6)). And, the Shews' real estate agent, Ms. Sickler, "confirmed that [Mrs. Shew] was involved in the sales process, but [Mr. Shew] had the say-so because she still works and he is retired." (Horvath Dep. Doc. # 27-1 at 23:20-22).

The Shews also contend Horvath did not have a reasonable basis for asserting they were aware of the sinkhole's presence and thus he could not reasonably conclude they intentionally failed to disclose the sinkhole. Along with stating Mr. Shew handled the lawsuit, Mrs. Shew told Horvath she believed the lawsuit was for Farm Bureau's bad faith. (Id. at 20:14-18). Mr. Shew also thought the lawsuit against Farm Bureau was based on the non-renewal of their home owners' policy, which Mr. Shew had explained to Horvath. (Id. at 17:2-11). Moreover, the Shews claim they never read the lawsuit, settlement agreement, or B.A.S.I.C.'s report. (F. Shew Dep. Doc. # 49-7 at 62:21-25; 104:12-17; R. Shew Dep. Doc. # 50-3 at 56:8-9; 72:8-22).

But, the Shews' statements to Horvath in their interviews that they were unaware of sinkhole activity and signed various legal documents without reading them do not undermine the existence of arguable probable cause. Horvath

acknowledged in his probable cause affidavits that Mr. and Mrs. Shew denied knowledge of the sinkhole. (Doc. # 49-3 at 2; Doc. # 49-4 at 2). The judge issued the arrest warrants anyway. While Horvath reported the Shews' claims of ignorance, he was not required to believe them in light of the other evidence available to him. See Rodriguez, 294 F.3d at 1278; see also Beauchamp v. City of Noblesville, Ind., 320 F.3d 733, 744 (7th Cir. 2003)("[C]riminal suspects frequently protest their innocence, and a suspect's denial of guilt generally is not enough to trigger a duty to investigate in the face of a reasonably believable witness and readily observable events.").

Here, Horvath had evidence not only that the Shews knew there was a sinkhole on their property (the Shews' complaint against Farm Bureau alleging the existence of sinkhole damage, their subsequently signed settlement for the policy's limits, and B.A.S.I.C.'s report concluding there was a sinkhole), but also that the Shews intentionally failed to disclose such information (the signed sales contract with its disclosure clause). A reasonable officer in Horvath's position could have disbelieved the Shews' claims that, although they signed all the legal documents and had

B.A.S.I.C.'s report in their possession, they were unaware of those documents' contents.

Equally unpersuasive is the Shews' contention that Horvath lacked probable cause to believe the Shews intentionally failed to disclose there was a sinkhole because there was disagreement among experts about the cause of the property's structural damage. As the Court understands it, their argument goes like this: assuming the Shews had read and were aware of the contents of the various expert reports, a reasonable officer in Horvath's position still could not conclude that the Shews knowingly failed to disclose the existence of a sinkhole because they themselves could not know there was a sinkhole in the face of conflicting evidence.

But, again, Horvath explained in the probable cause affidavits the history of the expert sinkhole investigation. The judge issued the warrants nonetheless. Cf. Paullin v. City of Loxley, 171 F. App'x 773, 777 (11th Cir. 2006)("[W]e reject Paullin's argument that Mitchum's knowledge of the existence of a lien should have signaled to Mitchum that he was faced with a civil dispute, rather than a criminal matter. Magistrate Hicks also knew of the existence of a lien but still issued the arrest warrant."). Horvath disclosed that HSA Engineering and Scientists and Universal Engineering

Sciences had initially determined there was no sinkhole on the Shews' property. (Doc. # 49-3 at 1). But, after the Shews initiated a lawsuit against Farm Bureau, arguing that there was a sinkhole, they hired B.A.S.I.C., which issued a report finding there was a sinkhole. After reviewing B.A.S.I.C.'s report, Universal Engineering Sciences changed its findings and agreed with B.A.S.I.C. that there was sinkhole damage to the Shews' home. (Id.).

The Shews do not contest Horvath's outline of the expert reports, nor do they point to other expert information that was omitted from the affidavit. And, to the extent a disagreement between experts could cause the Shews to doubt there was a sinkhole, a reasonable officer could still conclude that the Shews were being dishonest about their knowledge. Mr. Shew told Horvath he "had no idea" there was a sinkhole on his property. (Horvath Dep. Doc. # 27-1 at 15:23-24; 16:21-22); see also (Doc. # 49-3 at 2).

But, if he was aware of the conflicting reports, then Mr. Shew was on notice there may be a sinkhole on his property. Mr. Shew's knowledge that some experts reported a sinkhole on the property is incompatible with his claim that he had "no idea" there was a sinkhole. Other contradictions in Mr. Shew's statement to Horvath could lead a reasonable

officer to doubt the Shews' honesty about the extent of their knowledge. As Horvath described in his deposition:

> [Mr. Shew] made another statement that made no sense based on his self-proclaimed ignorance. He stated that prior to listing the home on the market, he checked with the Hernando County Clerk and property appraiser to see if any official reports had been on file against his home and property regarding confirmed sinkhole activity. He claimed to have found nothing. However, I discovered an official document that was filed by Farm Bureau Insurance stating just that, dated October 6, 2010, and recorded on October 14, 2010.

(Horvath Dep. Doc. # 27-1 at 18:4-12). Knowing what Horvath knew, an officer could have reasonably concluded Mr. Shew was being dishonest about the extent of his knowledge, and concluded from such dishonesty that the Shews had intentionally lied about the sinkhole to the Jernigans.

## IV. **Conclusion**

While the Court understands the embarrassment and frustration felt by the Shews, "[t]he Constitution does not guarantee that only the guilty will be arrested." Baker v. McCollan, 443 U.S. 137, 145 (1979). And, while they are dissatisfied with Horvath's investigation, that dissatisfaction does not alter the Court's analysis. Cf. Dickson v. Creel, No. 4:16CV81-RH/CAS, 2016 WL 6824385, at *2 (N.D. Fla. Nov. 17, 2016)("Mr. Dickson criticizes the officers' performance, but the controlling issue is simply

whether there was probable cause to believe Mr. Dickson participated in the thefts."). Taking the evidence in the light most favorable to the Shews, Horvath had at least arguable probable cause for their arrest and is entitled to qualified immunity. Horvath's Motion for Summary Judgment is granted, and the Shews' Motion for Partial Summary Judgment is denied.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant William Horvath's Motion for Summary Judgment (Doc. # 50) is **GRANTED.**

(2) Plaintiffs Rickey and Frances Shew's Motion for Partial Summary Judgment (Doc. # 49) is **DENIED.**

(3) The Clerk is directed to enter judgment in favor of Defendant William Horvath, and thereafter **CLOSE THE CASE.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 19th day of April, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE